**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| REGINA EVANS and STEVEN WINTERS, for themselves and as next friend of their minor children, REYSHYLA WINTERS and SEVAYLA WINTERS; and JESSIE EVANS, | ) ) ) ) ) | |
| | ) | |
| Plaintiffs, | ) | Case No. |
| v. | ) | |
| | ) | District Judge |
| THE CITY OF CHICAGO; Chicago police officers JUAN L. PEREZ (star #19056); SANCHEZ (#10159); SGT. RIVERA (#2101); and other, CURRENTLY UNKNOWN CHICAGO POLICE OFFICERS, | ) ) ) ) ) | Magistrate Judge |
| | ) | |
| Defendants. | ) ) | Jury Demanded |

## COMPLAINT

### Summary

1.     Plaintiffs, by and through their attorney, The Law Offices of Al Hofeld, Jr., LLC, bring this action against defendants City of Chicago and Chicago police officers pursuant to 42 U. S. C. § 1983 and Illinois state law for needlessly traumatizing two little girls, their mother, father, and grandfather and violating their Constitutional rights, alleging as follows:

2.     At about 9:40PM, on Wednesday, August 7, 2019, 4-year-old Reshyla and 9-year-old Savayla, were lying in their beds asleep in the bedroom they shared in their third-floor apartment at 1144 N. Lawler Avenue, in Chicago's Austin community.  Their parents, Ms. Evans and Mr. Winters, were eating a snack and talking in bed in their bedroom across the hall.  Mr. Evans, who was retired and 73, was in bed asleep in his bedroom.

3.      Suddenly, without plaintiffs' consent, without a search warrant or any exception to the warrant requirement, and without knocking or announcing their office and waiting for plaintiffs to open the door, defendant Chicago police officers kicked open the front door of plaintiffs' apartment with guns drawn, pointed guns at Mr. Winters and screamed at him to "GET DOWN ON THE FUCKING FLOOR!"  An officer then threw him to the floor; Mr. Winters landed on his face, chest and knee.  The officer then put a knee in his back, a gun to the back of his head, and felt his pulse on his wrist.

4.      At the same time, another officer proceeded down the shotgun hallway and entered Reshyla and Savayla's bedroom and pointed a flashlight and a gun at each girl's head as they were lying in their twin-size beds, awakened by the noise and commotion.  The girls saw the officer pointing his gun at them a couple feet away.

5.      A third officer entered elderly Mr. Evans' bedroom, flicked on the light and pointed a gun directly at him as he lay in his bed asleep, before waking up and throwing off the covers to see what was happening.

6.      Officers entered plaintiffs' apartment without a warrant or the plaintiffs' consent because they recklessly believed that a reported suspect had entered plaintiffs' three-story apartment building and plaintiffs' apartment specifically.  The officers were entirely wrong.  Their BWC videos show they were wrong.  They show officers did not find anyone in plaintiffs' apartment but plaintiffs.  They do not show anyone entering or exiting plaintiffs' building or plaintiffs' apartment.  Officers did not find any sign that any suspect had entered.  Officers did not arrest anyone.  The terror and stress to this innocent family was all for naught.

7.      At all times, officers' guns were loaded, and their fingers were on the triggers.  Plaintiffs followed all officer instructions from the moment of entry; Mr. Evans was

even tried to open the door for them while they were kicking it in.  Plaintiffs did not pose any apparent, actual or possible threat to the officers whatsoever at any time.  Moreover, they repeatedly asked the officers what was going on.  Officers ignored their questions.  They were rude and disrespectful.  They did not apologize.

8.     Defendant officers' complete blunder violated plaintiffs' Fourth Amendment Right to be secure against searches and seizures of their home and, once again, defendant officers' indiscriminate pointing of guns at all family members, including 4- and 9-year-old children, traumatized an innocent family.

9.     Officers' excessive force against the children was also not a rogue or isolated event:  it was undertaken pursuant to the City of Chicago's systemic, unofficial policy of using excessive police force against children and their families in the minors' presence, as elaborated below.

10.     As a direct result of this incident, the children, Mr. Winters, Ms. Evans and Mr. Evans now suffer severe, long-term, emotional and psychological distress, including symptoms of Post-Traumatic Stress Disorder.

## JURISDICTION AND VENUE

11.     This action arises under 42 U. S. C. § 1983 and *Monell v. Department of Social Services of the City of New York*, 436 U. S. 658 (1978).  This Court has jurisdiction pursuant to 28 U. S. C. §§ 1331 and 1343.  The Court has supplemental jurisdiction of plaintiffs' state law claims.

12.     Venue is proper pursuant to 28 U. S. C. § 1391(b).  The underlying events occurred within the Northern District of Illinois; defendant City of Chicago is a municipal corporation located within the District; and all parties reside in the District.

## PARTIES

13. At the time of all relevant events, plaintiff Regina Evans was a 32-year-old, mother of two children residing in her apartment at 1144 N. Lawler Avenue, third-floor apartment, in the Austin neighborhood in Chicago. Ms. Evans was a stay-at-home mom to several young children.

14. At the time of all relevant events, plaintiff Steven Winters was a 35-year-old father of two children residing at 4937 S. Justine Avenue, third-floor apartment, in Chicago. He worked full-time as a production laborer making air conditioner parts.

15. On the incident date, Ms. Evans and her family had lived in the apartment for five days. They did not know any neighbors or people in the neighborhood.

16. At the time of all relevant events, plaintiff Reshyla Winters was a 4-year-old girl residing with her mother, father, sister and grandfather at 1144 N. Lawler Avenue, third-floor apartment, in Chicago.

17. At the time of all relevant events, plaintiff Savayla Winters was a 9-year-old girl residing with her mother, father, sister and grandfather at 1144 N. Lawler Avenue, third-floor apartment, in Chicago.

18. At the time of all relevant events, plaintiff Jessie Evans was a 73-year-old father and grandfather residing with his daughter's family at 1144 N. Lawler Avenue, third-floor apartment, in Chicago. He was retired. Mt. Evans had never been arrested or had guns pointed at him.

19. Plaintiffs are African American.

20. At all relevant times, plaintiffs had a lawful and valid lease on the third-floor apartment at 1144 N. Lawler Avenue in Chicago.

21.     Defendant City of Chicago is a municipal corporation under the laws of the State of Illinois.

22.     At the time of all relevant events, defendant officer Ricky Rivera (#2101) was a sergeant and on-scene supervisor at plaintiffs' residence.  Additionally, officers Perez (#19056) and Sanchez forcibly entered plaintiffs' apartment and pointed guns at family members.  The following officers also entered plaintiffs' apartment:  Diaz, Donovan, and Rakochy.

23.     Not all officers who entered plaintiffs' apartment were wearing body worn cameras (BWCs) or not all videos from all BWCs in plaintiffs' apartment have been produced by the City.  Further, even though multiple officers (approximately 15 or more) were on the scene and surrounded and/or entered plaintiffs' apartment, a very brief and cursory incident report lists a mere three officers (Perez, Sanchez and Rivera).  Other officers who entered plaintiffs' apartment and/or were on scene include officers Diaz, Donovan, Rakochy, Lozano, Garfield, and Nicholas.  Once plaintiffs obtain full names and star numbers for all officers who entered their apartment, they will join them as defendants and allege their acts and/or inaction in an amended pleading.

24.     When Chicago police officers entered plaintiffs' apartment at 1144 N. Lawler, third floor apartment, in Chicago, they were at all times acting under color of law and within the scope of their employment as officers of the Chicago Police Department ("CPD") for the City of Chicago.

***Overview:  CPD's <u>M. O.</u> is Excessive Force, Including
Against and in the Presence of Children and Youth***

25.     Chicago police officers have a *de facto* policy, widespread practice or *M. O.* of using unnecessarily or excessive force against citizens of color, including children and youth, and against their adult family members in front of the children, which traumatizes them.

26.     The 2017 United States Department of Justice investigation of the CPD concluded, among other things, that CPD has a pattern and practice of using excessive force against citizens, including children.  https://www.justice.gov/opa/file/925846/download at 34. DOJ also found that CPD's uses of force, whether reasonable or unreasonable, disproportionately involve Chicago's citizens and youth of color, especially African-Americans.  (Id. at various). DOJ also found that CPD's excessive force runs the gamut of specific types of force and includes pointing guns at citizens.  (Id.).

27.     In addition, the 2016 report of the mayoral-appointed Chicago Police Accountability Task Force ("PATF") contained similar or parallel conclusions.  Among other things, it concluded that most CPD officers are not trained or equipped to interact with youth. https://chicagopatf.org/wp-content/uploads/2016/04/PATF_Final_Report_4_13_16-1.pdf at 55. PATF recommended a number of specific reforms, including training, in order to improve police interactions with youth so as not to traumatize them. (Id.)

28.     Despite clear, actual notice of these findings, CPD and the City did not subsequently implement any changes in CPD policy, procedure or training in order to remedy or otherwise address officers' practice of using excessive force against or in the presence of children.  Further, none of the reforms and new training that CPD did undertake in the wake of the DOJ and PATF reports addressed Chicago police officers' use of excessive force against children.

29.     For instance, following the release of the DOJ report in 2017, CPD revised its use of force policy, GO3-02, but did not include any changes that expressly require officers not to refrain from pointing guns at or using force against or in the presence children, when possible, or to otherwise use a trauma-informed approach to the use of force in situations where children are present.  Nor did CPD's 16-hour officer training that accompanied implementation of the new use of force policy include any instruction regarding the use of force and children or the pointing of guns at them or others.

30.     Similarly, through 2019, CPD did not revise its search warrant policy, SO9-14, or its search warrant training to include any requirements or instruction that officers refrain from pointing guns at or using force against or in the presence children, when possible, or use a trauma-informed approach to the use of force in situations where children are present.

31.     Moreover, in the federal consent decree the City agreed to with the State of Illinois and that was entered by Judge Dow in January, 2019 in *State of Illinois v. City of Chicago*, 17-cv-6260, the City did not commit to any reforms to remedy the problem. http://chicagopoliceconsentdecree.org/wp-content/uploads/2019/02/FINAL-CONSENT-DECREE-SIGNED-BY-JUDGE-DOW.pdf

32.     Further, unlike other major U.S. metropolitan police departments - such as New York, Cleveland, Indianapolis, Charlotte, Baltimore and San Francisco - CPD still does not have any policy or provide any training on policing children and youth in ways that are trauma-informed and that avoids exposing them to police use of force.

33.     In addition, the traumatic and long-lasting impact on children's health from exposure to violence is well-established scientifically and was well-understood by the City of Chicago at all relevant times.  Indeed, until approximately 2012 the Chicago Department of

Public Health had a program, Chicago Safe Start, that trained officers in two police districts about the impact on young children of exposure to violence. Nevertheless, the City cut and effectively terminated this training and failed to replaced it, even after receiving actual notice of the above findings regarding police and children in the DOJ and PATF reports.

34. In other words, despite the City's extensive knowledge, *via* Chicago Safe Start, that exposure to violence has a traumatic impact on children, CPD never implemented any policy or training to prevent officers themselves from harming children by pointing guns at them or using other unnecessary or excessive force against or in the presence of children.

35. It was also widely known by CPD, which extensively patrols "high crime" neighborhoods in Chicago, including plaintiffs' Back-of-the-Yards neighborhood, that many poor children of color are traumatized by exposure to violence in their neighborhoods before interacting with police. In other words, in such neighborhoods CPD officers *expect* to encounter children with a preexisting history of trauma. Nevertheless, despite this knowledge CPD failed to require or train officers to avoid pointing guns at and otherwise using excessive or unnecessary force against and in the presence of children, with the result that they compounded the trauma of the children they encounter.

36. On January 3, 2020, in response to over a year of lawsuits and media coverage regarding officers pointing guns at and handcuffing children, CPD revised its search warrant policy and training to nominally require officers to "maintain a sensitive approach and use due care to safeguard the physical and emotional well-being" of any children present "to minimize trauma following the execution of a search warrant." (SO-19 VIII. E. 3.). However, both the nebulous policy and the officer training done on the new policy during January and February, 2020, failed to require officers to refrain from pointing guns at or otherwise using

excessive or unnecessary force against or in the presence of children. Moreover, CPD has failed to enforce its new policy through appropriate discipline.

## FACTS RELATING TO ALL COUNTS

### *Officers' Blunder Violates the Sanctity of Plaintiffs' Home*

37.     On information and belief, on Wednesday, August 7, 2019, at approximately 9:30PM, Chicago police received a call about a person with a gun at the gas station located at the Northwest corner of North Lawler and Division Street.  According to police, the caller included a physical description, namely a Black male wearing all black. According to other officer reports, the suspect also wore a hoodie.

38.     The gas station is on Division Street but is close to plaintiffs' apartment building, which is on the West side of North Lawler.  The two properties are separated by a fence and an alley, which both run East-West.  This gas station is just to the north of plaintiffs' apartment building.

39.     On information and belief, police, including defendant officer Perez, arrived at the gas station shortly after 9:30 in at least one marked vehicle.

40.     According to a police report officers wrote after they forcibly entered plaintiffs' apartment by mistake, officers saw four men standing near the mouth of the alley on the West side of Lawler, i.e., in front of plaintiffs' building.  According to police, when the four men saw officers moving in their direction, they began to flee on foot south bound on Lawler. One of the men apparently matched the description given by the caller (a Black male dressed in all black), and police claim he was holding his side, as if bracing "a possible weapon."

41.     Officers claim to have seen all four men, including one who matched the caller's description, run "into 1144 N. Lawler and up to the 3rd floor" where plaintiffs lived.

Officers also later said they heard someone yell, "third floor."  Officers Perez, Sanchez and other officers decided to pursue the men on foot.  Some of them, including officer Perez, had their guns drawn.

42.     However, officers' body worn camera video, which was turned on while officers were running and before they enter plaintiffs' building, does not show anyone fleeing or entering plaintiffs' building or plaintiffs' apartment.  Plaintiffs' three-story apartment building has one unit per floor.  The backyard of plaintiffs' building has an iron gate.

43.     Moreover, it was physically impossible for officers to see inside the front of plaintiffs' building to tell which apartment, if any, the suspects entered, if the entered the building at all.

44.     The defendant officers were completely wrong.  None of the suspects entered or exited plaintiffs' apartment at any time.  Plaintiffs had no knowledge of or connection to any of the four suspects whom police chased.  Plaintiffs were not in any way involved in any incident that took place at the gas station at Division and Lawler on the evening of August 7, 2019.

45.     Body Worn Camera (BWC) footage shows officers Perez, Sanchez and other officers entering plaintiffs building and running up the stairs to plaintiffs' third floor apartment with their guns drawn.

### Officers Point Guns at 4-Year-Old Reshyla and 9-Year-Old Savayla

46.     As officers' pursuit got underway, Ms. Evans and Mr. Winters were sitting in bed in their bedroom talking while Mr. Winters ate a snack of crackers and hot meat before going to sleep.  Mr. Winters had to work the next day.  Jessie Evans was already fast asleep in

bed in his bedroom.  4-year-old Reshyla and 9-year-old Savayla were asleep in their beds in the bedroom they shared.

47.     The apartment was quiet.  Plaintiffs had just moved into the third-floor apartment at 1144 N. Lawler approximately five or six days earlier.

48.     At approximately 9:40PM and as shown on officers Body Worn Cameras (BWCs), without knocking or announcing their office, defendant officers started beating, banging on and kicking plaintiffs' apartment front door while screaming, "OPEN THE FUCKING DOOR! OPEN THE MOTHER FUCKING DOOR!"  Plaintiffs did not hear "police" and did not know it was the police.

49.     Mr. Winters got up and went to the door, saying "Wait, wait" and "What's going on?"

50.      As Mr. Winters was standing in front of the front door trying to open it, suddenly Chicago police officers kicked open the front door of plaintiffs' apartment and pointed guns at Mr. Winters, who went into obvious shock, and then screamed at him to get down on the floor, "GET DOWN! SHUT THE F--- UP!"

51.     Officers did not have a search warrant and did not ask Mr. Winters or any plaintiff for consent to enter and search their apartment.

52.     His mouth still full of food from a snack, Mr. Winters had come to the front hallway to open the door as officers started to kick it in.  As defendant officer Sanchez was kicking it, Mr. Winters can be heard on BWC calling repeatedly, "What's going on?  What's going on?  What's going on?" Instead of answering him, officers ignore him, and officer Sanchez continued kicking the door until it broke open.

53.     When the broken door flew open, three officers - Perez, a patrol officer in a blue shirt and a black vest, and Sanchez – entered plaintiffs' apartment in that order.  Sgt. Rivera entered soon after.  Officer Perez and the patrol officer pointed their guns at Mr. Winters.[1]

54.     Fearing for his life, Mr. Winters began to get down onto the floor.  The patrol officer then grabbed Mr. Winters' left wrist, twisted his arm, and forcefully slammed his body down onto the hard floor.  Mr. Winters landed on the right side of his face, on his chest and on one knee.  Mr. Winters had bruises and soreness in each of these areas of his body that lasted several days.  The back of his head also hurt.

55.     After slamming Mr. Winters face down onto the floor, the patrol officer then got on top of him and inserted a knee into the center of Mr. Winters' back and aimed his gun at the back of his head.  The gun touched his head.  The officer then checked Mr. Winters' pulse on his wrist to determine if he was the fleeing suspect.  At some point, the officer patted him down and/or searched him.  When he spoke, the officer told him to "SHUT THE FUCK UP!"

56.     As shown on BWC, multiple officers, including the patrol officer, held Mr. Winters on the floor at gunpoint for several minutes, long after they knew he was not the suspect.

---

[1] In response to a pre-suit FOIA request, the City of Chicago produced BWC footage for officers Perez and Sanchez. However, the City of Chicago has not produced BWC footage for the second officer to enter plaintiffs' apartment, the patrol officer wearing the blue shirt and the black vest.  The CPD Order required all patrol officers to wear and activate their BWC for all law enforcement activities, including chases and home entries.  At this time, it is unclear whether the City has withheld this particular BWC video or the officer failed to wear or turn it on.

57.    In addition to not having a sufficiently elevated pulse consistent with running down the street and up three flights of stairs, Mr. Winters did not match the description of the supposed suspect - he was not dressed in all black and did not have a gun.

58.    As the patrol officer slammed Mr. Winters on the floor, officers Perez and Sanchez turned right after entering the apartment and proceeded down the hallway with guns drawn.  Both officers pointed their firearm into the master bedroom where Ms. Evans was, and then officer Perez entered Mr. Evans' bedroom and pointed his firearm at Mr. Evans while he was lying in bed.  Mr. Evans woke up to see officer Perez's firearm pointed directly at him from just a few feet away.

59.    In addition, defendant officer Sanchez pointed his firearm directly at 4- and 9-year-old Reshyla and Savayla, even after officer Perez notified him that the occupants of the bedroom were children (Perez yelled "children on the right").  Although the lights were out in the girls' bedroom, the bedroom door was open, and light from the hallway and the officer(s)' flashlight entered the room, making the girls visible to the officer(s) and the officer(s) visible to the girls.  The girls were awake and lying in two twin beds, with their heads closest to the door. They had been awakened by the banging, yelling and commotion at the front door.

60.    Even though officers Perez and/or Sanchez could clearly see, with their flashlights shined on the girls, that small children occupied the two beds, nevertheless Sanchez reached into their bedroom and pointed his flashlight and black pistol at Reshyla's face first as she lay in her bed.  The gun was approximately two feet or less from her head when it was pointed at her.  Reshyla started crying immediately.  The officer then pivoted and pointed his flashlight and pistol at Savayla's head as she lay on her bed.  Savayla became physically frozen

13

with fear. The gun was less than 2-3 feet from Savayla's head pointed at her. Officer Perez or Sanchez did not say anything to the girls.

61.     Petrified with fear, the girls remained in their bedroom, crying, during the entire time that officers were in plaintiffs' apartment. Reshyla wet the bed during the incident; she had never a problem with bed-wetting prior to the incident. After officers left, the girls cried out, "Mommy."

62.     After Sanchez pointed his pistol at Reshyla and Savayla, officers Perez and Sanchez proceeded the remainder of the distance down the shotgun hallway, entered the kitchen, opened and exited the back door to signal and meet other officers who stationed in back and/or coming up the back stairs and to let them into the apartment. Officer Perez reached and opened the back door first. At this time and as shown on BWC video, neither Perez nor Sanchez nor any of the officers stationed in back of plaintiffs' building saw any person exit plaintiffs' apartment or descend the back stairway and flee the building. None of the alleged suspects ever entered or exited plaintiffs' apartment.

63.     Approximately 5-6 other Chicago police officers entered plaintiffs' apartment and fanned out. Officers entered and searched every room in plaintiffs' apartment for the alleged suspects.

### *Fruitless Entry and a False Police Report*

64.     Defendant officers did not find the reported suspect in the apartment or any sign that he had ever entered or exited plaintiffs' apartment. Officers did not arrest or charge anyone. No contraband was discovered.

65.     From the first moment officers started entering plaintiffs' door and throughout their search of plaintiffs' apartment and building, Mr. Winters and Ms. Evans

repeatedly asked officers what was going on and whey officers were in their apartment. Plaintiffs believe they asked that question approximately 50 times. Officers ignored them and refused to give them any information.

66.     But throughout the raid, officers spoke to plaintiffs in a nasty and dehumanizing tone. They screamed and shouted, cursed and were rude and disrespectful.

67.     At one point when Ms. Evans asked, "What's going on?" an officer responded: "SHUT THE FUCK UP!" When she asked Sgt. Rivera, he just walked away.

68.     Officers were inside plaintiffs' apartment for approximately 10 minutes before any officer told them what was going on.

69.     Much later, long after the apartment was secure and long after it was obvious that there was no sign that any suspect had ever entered or exited the apartment, officers began speaking to Ms. Evans, Mr. Winters and Mr. Evans, explaining the situation and answering their questions. Sgt. Rivera spoke to Mr. Winters and Ms. Evans. Officers were inside plaintiffs' apartment for approximately 30 minutes.

70.     Officers damaged plaintiffs' apartment. Officer Sanchez broke plaintiffs' apartment front door when he kicked it open. Sgt. Rivera later looked at plaintiffs' front door and determined that it would not lock.

71.     Sgt. Rivera promised plaintiffs a new front door. He promised that the City would replace it within 24-48 hours. It did not. Plaintiffs had to live with a front door would not close or lock for 3-7 days in a neighborhood that is sometimes unsafe. The property manager for plaintiffs' building fixed plaintiffs' door.

72.     Before they left, officers did not explain that they had made a mistake. Eventually, towards the end of the incident, Sgt. Rivera apologized to Ms. Evans.

73.     Although he apologized to Ms. Evans, Sgt. Rivera supervised officer Perez's writing of an incident report and wrote a report himself (a claims notification) in which both falsely suggested that the alleged fleeing suspects had actually run into plaintiffs' apartment and eluded capture by running out the back door and "making good their escape."

74.     The reports falsely suggest that officers heard and saw suspects running into and out of plaintiffs' apartment and/or away from plaintiffs' rear porch.  These were totally false statements; BWC from officers located inside plaintiffs' apartment and in the rear of plaintiffs' building does not show anyone entering the front of plaintiffs' building, anyone inside plaintiffs' apartment, anyone exiting plaintiffs' back door or anyone running from plaintiffs' rear porch or the rear of the building.  BWC shows that no suspects were in sight anywhere.

75.     Officers knew their statements were false at the time they included them in their report.  They included the false statements *post hoc* in their reports in an effort to justify and cover up their wrongful entry into plaintiffs' apartment in violation of the Fourth Amendment.

76.     In fact, officers did not have probable cause to believe that someone had entered their apartment, and no exigency existed that justified their warrantless entry.  Officers committed a blunder and then compounded the harm by engaging in excessive force against children and falsifying a report to cover up their original mistake.

### *Officers' Excessive Force Against Plaintiffs, Especially 4- and 9-Year-Old Girls, Was Totally Unnecessary*

77.     Plaintiffs presented absolutely no threat, real or apparent, at any time to any of the defendant officers who entered and searched their home.  They did not resist, flee, or look anything like the alleged suspects.

78.    Officers quickly discovered – within seconds of entering – that no one resembling the report suspect or his description was present in the apartment, and they found no sign that he had ever entered or exited the apartment.

79.    Nevertheless and even though plaintiffs presented no threat, defendant officers repeatedly pointed their guns at plaintiffs, and any who did not point their guns at plaintiffs did not intervene to ask those pointing guns at plaintiffs to stop.

80.    Plaintiffs have been harmed by officers' unnecessary pointing of guns, unlawful detention, unlawful search of their persons and home, and their destruction of their personal property.

### *Officers' Unnecessary Uses of Force Traumatized 4-Year-Old Reshyla and 9-Year-Old Savayla*

81.    Chicago police officers' terrorizing conduct towards plaintiffs caused them immediate, serious and lasting emotional and psychological distress.

82.    Prior to August 7, 2021, plaintiffs were happy and healthy people in a close, loving family.  They had never had police suddenly break into their home and point guns at them.  The girls had never suffered any kind of emotional or psychological trauma of any kind.  This all changed with defendants' actions.

83.    Throughout their encounters with police, plaintiffs were terrified.  Based upon officers pointing guns directly at his head, Ms. Evans and Mr. Winters were afraid Mr. Winters was going to be killed.  When they saw an officer point his gun at their heads, Reshyla and Savalya were afraid they were going to be shot.  When Mr. Evans woke up and saw an officer in his bedroom pointing his gun directly at him, he was afraid for his life.

84.    Plaintiffs could not sleep at all on the night of the incident.   Mr. Winters was unable to go to work the next day.

85.     Ever since the incident, plaintiffs have continued to re-live, in various ways, how terrified they were that day.

86.     Reshyla states that, when the officer pointed his gun at her, she thought he was going to hurt her.  She felt very afraid and sad.

87.     Until recently, each time her mother and/or father asked her to tell them what happened when the officer was in her bedroom, Reshyla went completely silent, hung her head downward and began to cry.  Although she could not speak about the incident, she would demonstrate how the officer pointed a gun at her.

88.     The girls were changed dramatically by officers' conduct on August 7, 2019.  They are different girls now.

89.     Since the incident, they cry easily and often.  Reshyla has had a dramatically decreased appetite.  She does not even eat much candy anymore.  She stays close to her mother and does not like to leave the house, ride her bike, or get ice cream.  Before the incident, the girls wanted to be outside often.

90.     Since the incident, both girls have had nightmares involving guns.  When her parents wake her up from sleep, Reshyla is startled and jumps.  Both girls are drenched with sweat when they wake up from their nightmares.

91.     After the incident, Reshyla began to act out destructive behaviors.  She started pouring out all of the sugar, detergent and shampoo.  She started cutting up and destroying things with scissors.  She cut up her new shirts, her new pajamas, and her brand-new shoes and could not wear them.  Reshyla did not engage in any of these behaviors before the incident.

92.     Savayla now has trouble falling asleep at night; it takes her an hour or more.  She had no trouble falling asleep prior to the incident.

93.     Memories from the incident – in particular of officer Sanchez pointing a gun at her head - return to Savayla whenever she is trying to fall asleep.

94.     Since the incident, Savayla has had frequent, bad dreams in which an officer points a gun at her head.  This same dream recurs every time.  She still has this dream approximately every other night.  Each time she has a bad dream, it takes Savayla about an hour to fall back asleep.  Savayla did not have bad dreams prior to the incident.

95.     Since the incident, Savayla not only feels nervous and afraid whenever she sees a police car or a police officer, but she runs and hides behind relatives.

96.     Since the incident, both girls have continued to wet their beds.

97.     Officers' conduct has altered Mr. Winters' sense of personal safety and his sense of his family's safety.  Before the incident, Mr. Winters felt that he and his family were safe in their home.  Since the incident, he no longer feels safe in his own home and no longer believes his family is safe there.

98.     Mr. Winters now has trouble falling asleep at night.  Whereas before the incident he would fall asleep within 5 minutes, it now takes him an hour or more.  He would lie in bed awake worried about his wife and children and afraid that something was going to happen.  When he finally falls asleep, he wakes up at least two times every night.  He gets up, checks on everyone, especially the girls, checks and re-check doors, hallways, and the back porch to make sure everyone and everything seems secure and safe.

99.     After the incident, Mr. Winters began having nightmares at least 3-4 times per week when I could sleep.  Two years after the incident, he still has nightmares 2-3 times per

week. In his nightmares, he is either being chased by the police or he hears his girls screaming. When he hears his girls screaming, he jumps up and runs in his girls' bedroom to check on them.

100. The incident also triggered older traumas for Mr. Winters.

101. Mr. Winters has lost all trust in the police and finds himself avoiding them.

102. On the night of the incident, Ms. Evans sobbed when she saw or learned that officers pointed guns at her husband, father and daughters. She feared for her their lives.

103. Since the incident, Ms. Evans has had gruesome nightmares of police shooting and killing her family members. She has been placed on medication for depression.

104. Mr. Evans, who had lived in Chicago for 50 years, was in complete shock after the incident and now feels a general sense of fear all the time as the result. He's afraid of having a heart attack and no longer trusts the police.

105. Plaintiffs continue to experience and exhibit, unabated, these and other signs of serious emotional and psychological trauma and distress.

106. On information and belief, plaintiffs have, or have many of the symptoms of, Post-Traumatic Stress Disorder.

107. As a direct result of officers' conduct, plaintiffs are now being medically assessed for trauma inflicted by the Chicago police.

108. On information and belief, plaintiffs will require counseling in order to cope with the long-term, psychological injuries inflicted by defendants' display of excessive force.

109. Officers' shocking actions of pointing and training a loaded gun at close range on a 4- and 9-year-old children constituted serious abuses of power and authority.

110.    Officers' actions – including their inaction in the form of failing to intervene to request that fellow officers stop using excessive force - were directed towards a 4- and 9-year-old child.  Plaintiffs' sensitivity and vulnerability to such trauma-inducing violence was or should have been known to officers.

111.    Officers' conduct was undertaken pursuant to and is part of a long-standing and widespread pattern and practice, *de facto* policy or *MO* of excessive force noted above, which includes the use of excessive force against and/or in the presence of children of color.

## COUNT I – 42 U. S. C. § 1983 *MONELL* POLICY CLAIM
## <u>AGAINST THE CITY OF CHICAGO</u>
### (Minor Plaintiffs)

112.    Minor plaintiffs Reshyla and Savayla Winters re-allege all paragraphs 1-111 above, including the *Monell*-related allegations of paragraphs 25-36 above, and incorporate them into this count.  They assert this claim, through parents as next friends, against defendant City of Chicago.

113.    Defendant officers' use of excessive force against Reshyla and Savayla was directly and proximately caused by one or more of the following four, specific, long-standing, interrelated, *failures* of official policy, *lack* of official policy, and *de facto* policies, widespread practices, and/or customs of the City of Chicago:  1) a pattern and practice of using unnecessary or excessive force against citizens, including children; 2) a failure to have any policy about when it is appropriate for officers to draw and point their firearms at citizens, including children; 3) a systemic failure to investigate and discipline and/or otherwise correct allegations/incidents of officer excessive force against citizens, including children and/or their close relatives in the minors' presence; and 4) an absence of official policy and training for

officers to refrain from pointing guns at or otherwise using excessive or unnecessary force against or in the presence of children. Each of these policies existed for more than ten years prior to August 7, 2019 ("the *Monell* period") and was the moving force behind the officers' conduct that resulted in the violation of Reshyla and Savayla's constitutional rights and the direct causal link between the City's actions/inaction and the deprivation of their rights.

114. First, defendant City of Chicago has a long-standing, pervasive practice and custom of failing to adequately investigate, intervene with and discipline or otherwise correct officers for the use of excessive force against citizens, including children.

115. Of the hundreds of citizen misconduct complaints filed with BIA, IPRA and COPA during the *Monell* period that involved allegations of officer excessive force against a young child, including pointing guns at them, none were sustained, none resulted in any officer discipline, and the vast majority of complaints were not even investigated. Moreover, as the DOJ found, all excessive force complaints, including those involving the unjustified pointing of guns, were inadequately investigated, rarely sustained, and even more rarely disciplined.

116. This set of City's widespread practices or customs directly encouraged, sanctioned, authorized and was the moving force behind officers' conduct towards Reshyla and Savayla. The City's historical failure, leading up to August 7, 2019, to properly intervene in, investigate and discipline officer excessive force, especially excessive force against or in the presence of children, sent officers the clear message that they had a general freedom and license to engage in excessive force, including excessive force against children, without fear of being corrected, investigated or disciplined. This caused defendant officers to act without appropriate restraints towards Reshyla and Savayla.

117.    The City had actual and constructive notice during the *Monell* period of each of these failures of official accountability from a) a long-standing, continual stream of citizen excessive force misconduct complaints to IPRA and COPA that were not properly investigated as well as from b) the specific conclusions reached by and the data contained in the 2017 DOJ and the 2016 PATF reports (see *supra*).

118.    Second, contrary to commonly accepted standards and best practices in law enforcement, CPD failed to have any official policy, guidance or training regarding when it is appropriate for officers to draw their service weapons, have their guns out, and/or point them at citizens, including and especially children.  In fact, CPD has long refused and still refuses to refer to an officer pointing a gun at someone as "a use of force."  Moreover, since 2019, CPD has attempted to track the number of times officers point their firearms at citizens but has done nothing with the data collected, including no re-training and no policy reform. These failures gave officers official legal sanction and free reign to point their guns at citizens, including children like Reshyla and Savayla, without any official restraint or consequences.

119.    Third, defendant officers' conduct towards and in the presence of Reshyla and Savayla was undertaken as a direct consequence of defendant City of Chicago's long-standing failure to have *any* affirmative, official policies and/or training explicitly requiring officers to refrain from pointing guns at and otherwise avoiding the use of excessive or unnecessary force against or in the presence of children when possible.

120.    Even after the DOJ and PATF findings regarding force and children were known to final City policy makers in 2016 and 2017 – constituting actual notice to the City - the City failed to implement any reforms to remedy the pattern and practice of excessive force against or in the presence of children.  This failure amounted to a deliberate and conscious

choice not to take action to prevent future violations of people's constitutional rights, including Reshyla and Savayla's. In other words, in the wake of the DOJ and PATF findings, the City opted not to adopt any reforms despite the known and obvious risk that the pattern of excessive or unnecessary force noted by DOJ and PATF would lead to constitutional violations in the future. The City knew that, without reforms, children's rights would continue to be violated. Thus, the City's failure to implement reforms was a foreseeable cause of Reshyla and Savayla's injuries. In particular, the City's decisions not to reform official policies and training include, without limitation:

      a.     The continued absence of any provision in CPD's official use of force policy that would require or guide officers to refrain from pointing guns at or using excessive or unnecessary force against or in the presence of children or to use a trauma-informed approach to the use of force in situations where minors are present, and some force may necessary.

      b.     CPD's continued failure to add, in its official use-of-force training curriculum and/or its on-the-job training and supervision of officers, any explicit requirement or guidance that officers should refrain from pointing guns at or otherwise avoid using excessive or unnecessary force against or in the presence of children or to use a trauma-informed approach to the use of force in situations where minors are present, and some force may be necessary.

      c.     CPD's continued failure to require officers seeking residential search warrants to make reasonable efforts before obtaining and/or executing the warrant to determine, through investigation and surveillance, (i) whether minors reside in the residence, (ii) to avoid entry and search at times when minors are likely to be present (iii) to plan manner of entry and force tactics based on whether minors are expected to be present; (iv) to de-escalate

themselves or change tactics when they unexpectedly encounter children or youth, and/or (v) to take other precautions to avoid traumatizing minors and their close relatives, such as avoiding pointing guns at or placing parents and caretakers in handcuffs in the children's presence;

d.      CPD's rebuff, both before and since the U. S. Department of Justice and PATF reports were released, of national and local legal and/or community organizations that have offered to provide training on trauma-informed policing with children and/or offered to provide or draft model use-of-force policies that included explicit provision for avoiding excessive or unnecessary use of force against and in the presence of children;

e.      City's refusal or failure, despite its extensive knowledge, *via* Chicago Safe Start, of the traumatic effect of exposing children to community violence, to continue, expand, or reinstate any training to prevent officers themselves from harming children by pointing their guns at them or otherwise using excessive or unnecessary force against them or in their presence;

f.      City's and CPD's refusal or failure to propose or commit to, in the consent decree it negotiated and is now implementing in *State of Illinois, v. City of Chicago*, 17-cv-6260, any explicit protections for children from officers who would point their guns at them or otherwise not refrain from using excessive or unnecessary force against them and any provisions requiring a trauma-informed approach to policing children.

121.    The continual streams of excessive force complaints to IPRA and COPA, including those in which children were complainants or victims, also constituted actual and constructive notice to the City of a pattern and practice of excessive force that required remedial action.

122.     Fourth, the City's lack of official policies to protect citizens, including children from officers pointing guns at them and other excessive or unnecessary force, combined with its failure to hold accountable officers who use excessive force, have resulted in a *de facto* City policy and practice of using unreasonable force against citizens, including children, as concluded by DOJ and PATF.  This widespread practice was the moving force and direct causal link behind the officers' pointing of guns at Reshyla and Savayla on Augusts 7, 2019.  The excessive force used against Reshyla and Savayla was an example of and result of this *de facto* policy.

123.     Similar incidents of excessive force against children are the direct and foreseeable result of the same set of City policies.  For example, on August 29, 2013, Chicago police officers of the Area Central Gun Team executed a search warrant at 930 N. Keystone Avenue in Chicago for a person with no connection to the residence and pointed a rifle with a laser light directly at the chest of 3-year-old Davianna Simmons and pointed a handgun at her grandmother Emily Simmons' head in front of Davianna when neither presented any threat to officers.  The Simmons are African-American.  The officers were never investigated or disciplined for the incident.

124.     On January 29, 2015, while executing a search warrant at 1856 S. Lawndale, 2nd floor apartment, in Chicago for a person who had long been incarcerated (because officers failed to check the CPD CLEAR system or public records), Chicago police officers of Narcotics Unit 189 and the SWAT Alpha team pointed their assault rifles directly at brothers Justin and Jeremy Harris and Jaden Fields, ages 4, 6 and 11, respectively, and at their mother, Jolanda Blassingame, when the family did not pose any apparent threat to officers.  Ma.

Blassingame and her children are African-American. The officers were never investigated or disciplined for the incident.

125. On November 7, 2017, while executing a search warrant at 3557 S. Damen Avenue, 2nd floor, in Chicago for a target who actually lived in the building's 3rd *floor* apartment, a group of patrol officers pointed a handgun and an assault rifle directly at 5- and 9-year-old Jack and Peter Mendez and their parents, Hester and Gilbert Mendez, when none of them presented any apparent threat to officers. The Mendez family is Latino. The officers have not been investigated or disciplined for the incident.

126. On August 9, 2018, while executing a search warrant at 5033 S. Hermitage, 1st floor apartment, in Chicago for a person with no connection to the apartment or the residents (he was apprehended next door), members of the Area South Gun Team and the Alpha SWAT team pointed assault rifles at a 4-year-old girl, Lakai'Ya Booth, her 8, 11 and 13-year-old siblings, and their mother and grandmother, Ebony Tate and Cynthia Eason, when none of them presented any apparent threat to officers. Ms. Tate, her children and mother are African-American. The officers have not been investigated or disciplined for the incident.

127. On March 15, 2019, while executing a search warrant at 8914 S. Laflin in Chicago, members of the 7th District Tactical Team and the SWAT Alpha Team pointed assault rifles at 6, 8, and 9-year-old Royalty, Royal and Roy Smart and their mother, Domonique Wilson, as they walked from their house to the street with their hands up and then handcuffed 8-year-old Royal for approximately 40 minutes when none of them presented any apparent threat to officers. Ms. Wilson and her children are African-American. The officers have not been investigated or disciplined for the incident.

128.     On December 25, 2019, while investigating a robbery in Rogers Park, Chicago patrol officers entered a family's condominium at 1227 West Albion Avenue in Chicago without authorization and pointed handguns at 13-year-old Lazerick James, handcuffed one of his wrists, and dragged him through the apartment for several minutes before realizing their mistake, apologizing and departing.  Lazerick is African-American.  He did not pose any threat to officers' safety.  The officers have not been investigated or disciplined for the incident.

129.     Through their combined failures above, before and after actual and constructive notice, to enact official reforms that protect children from excessive and unnecessary force and to hold accountable officers who use excessive force against them or in their presence, the City has led police officers to be confident that such actions are acceptable and will not be challenged, investigated or disciplined by CPD, CPD's Bureau of Internal Affairs ("BIA"), the Chicago Police Board, the Independent Police Review Authority ("IPRA"), the Civilian Office of Police Accountability ("COPA") or the City of Chicago Inspector General ("IG").  These past failures directly authorized, encouraged and emboldened defendant officers' conduct against and in the presence of Reshyla and Savayla, providing them a general license to use excessive force, including excessive force against minors, whenever it suited them.

130.     Thus, through their combined failures, before and after actual notice, to enact official policies protecting citizens, including children, from excessive or unnecessary force and to hold accountable officers who use excessive force against or in the presence of children, final City of Chicago policy-makers – including the Superintendent of police, the Administrator of IPRA (now COPA), the head of CPD's BIA, the IG, the Mayor, and the Chicago City Council – condoned, approved, authorized, facilitated, encouraged and perpetuated

a *de facto* City policy and practice of unnecessary or excessive force against or in the presence of children.

131.    Finally, during all times relevant to the incident involving plaintiffs, a "code of silence" pervaded the police accountability system in Chicago, including CPD's BIA, the Chicago Police Board, IPRA and COPA, contributing to these agencies' collective failure to properly investigate and discipline officer excessive force, including excessive force against children and/or their close relatives in the minor's presence.  Defendant officers' conduct toward Reshyla and Savayla, including their failure to intervene and failure to report the actions of their colleagues, was the direct and foreseeable result of the long-standing and systematic code of silence at work in the City's police investigative and disciplinary systems.

132.    By means of its pervasive customs and practices above and its failures, after notice, to remedy officers' use of excessive or unnecessary force, including against or in the presence of children, defendant City of Chicago has manifested conscious and deliberate indifference to the deprivation of Reshyla and Savayla's constitutional rights.

133.    One or more of these four official policies, failures of official policy, practices and customs collectively, were the moving force behind defendant officers' conduct that directly and proximately caused the violations of Reshyla and Savayla's constitutional rights set forth above and below, such that the City of Chicago is liable for officers' conduct.

### *The City of Chicago's <u>De Facto</u> Policies Resulted in Violations of Plaintiff's Constitutional Right to be Free of Excessive Force*

134.    Officers' conduct toward the minor plaintiffs constituted excessive force, in violation of her rights under the Fourth and Fourteenth Amendments to the U. S. Constitution.

135. Under the circumstances, officers' pointing of guns at Reshyla and Savayla and other displays of force against them and in their presence were totally unnecessary, unreasonable and unjustifiable.

136. Under the circumstances, officers' uses of force against and in the presence of Reshyla and Savayla, undertaken in the presence of and witnessed by other plaintiffs, were totally unnecessary, unreasonable and unjustifiable.

137. Officers' misconduct was objectively unreasonable and was undertaken intentionally with willful indifference to Reshyla and Savayla's constitutional rights.

138. Officers' misconduct was undertaken with malice, willfulness, and recklessness indifference to the rights of others.

139. The officers' misconduct was undertaken pursuant to and as the direct, foreseeable and proximate result of the Defendant City of Chicago's *de facto* policy, failures of official policy, absences of affirmative policy, and pervasive, long-standing practices and customs, as set forth above, such that defendant City of Chicago is liable for officers' use of excessive force against and in the presence of Reshyla and Savayla.

140. Further, no officer present on the scene intervened to stop officers from pointing guns at Reshyla and Savayla. One or more officers had a reasonable opportunity to prevent or stop the violations of Lillie's constitutional rights but stood by and failed to take any action.

141. As set forth above, the officer misconduct was undertaken pursuant to the *de facto* policies, long-standing and pervasive practices and customs of defendant City of Chicago, such that the City of Chicago is also liable for officers' failure to intervene.

142.     Officers' inactions in this respect were objectively unreasonable and undertaken intentionally, with malice and reckless indifference to plaintiff's constitutional rights.

143.     As the direct and proximate result of officers' misconduct, Reshyla and Savayla has suffered and continue to suffer severe, long-term emotional and mental distress and trauma, including lasting or permanent psychological injury, as set forth above.

## COUNT II UNLAWFUL SEARCH – WARRANTLESS ENTRY - 42 U. S. C. § 1983
### (All Plaintiffs)

144.     Plaintiffs re-allege paragraphs 1-24 and 37-111 above and incorporate them into this count.  They assert this claim against all defendant officers who entered their apartment on August 7, 2019.

145.     Plaintiffs were innocent third parties with respect to defendant officers' forcible entry into and search of their home and persons.

146.     The Fourth Amendment to the U. S. Constitution prohibits entry into citizen's residences without a search warrant or probable cause.  It also prohibits the seizure of persons without an arrest warrant or probable cause.

147.     On August 7, 2019, defendant and non-defendant officers on the scene did not a search warrant or an arrest warrant for plaintiffs' apartment or for any plaintiff, respectively.

148.     At no time on August 7, 2019 did any plaintiff provide any form of consent to officers' forced entry or search of their home.  At no time did any plaintiff consent to be seized, detained or arrested.

149.     For reasons set forth above and below, defendant officers lacked facts constituting probable cause to enter plaintiffs' apartment or to arrest or detain any plaintiff inside.

150.    Defendant officers did not know who the person was whom they were pursuing.

151.    Defendant officers entered plaintiffs' home to seize and arrest a suspect whom a 911 caller (whom they never spoke to) told a dispatcher he observed at a gas station with a gun.  The caller's description – a male wearing all black - was sparse, vague and general, and common.  An officer also mentioned he was told the reported suspect was wearing a "hoodie."  This was the only description provided.  Officers did not have any information that the reported suspect had threatened anyone with the gun.  They did not know if he was dangerous or a felon.

152.    According to a police report, police did not see anyone at the gas station when they arrived.  Rather, police observed four men, not one, at the mouth of the alley adjacent to plaintiffs' building.  They believed one of these four men was the suspect whom the caller described.  When they observed the four men, they did not see a gun.  It was not clear to officers that the person they believed was the reported suspect was the same person or that the person was actually armed.  Moreover, they merely heard someone yell "third floor."  Defendant officers did not have a warrant for the suspect's arrest.

153.    According to the police report, defendant officers were in "hot pursuit" of someone who matched the caller's vague description of the man the caller reportedly saw with a gun at the gas station.

154.    However, in fact neither the reported suspect nor anyone else entered or exited plaintiffs' specific apartment at this time.   Defendant officers' body camera videos do not show anyone entering or exiting plaintiffs' apartment.  No defendant officer actually saw anyone enter plaintiffs' building or apartment or ascend the staircase to the third-floor apartment.  Officers merely heard someone say, "third floor."

155. In fact, before and as officers forcibly entered plaintiffs' apartment, other officers were stationed behind plaintiffs' apartment building, and those officers did not see anyone exit the back door of any apartment, descend the open stairway or exit the gated yard. BWC video from officers who were posted behind plaintiffs' apartment building before and as officers forcibly entered plaintiffs' apartment do not show anyone exiting the back door of any apartment, descend the open stairway or exit the gated yard.

156. Thus, defendant officers did not know whether that the suspect(s) had actually fled into plaintiffs' building and were even less confident that he/they had actually fled into plaintiffs' apartment. There was little to no reason to believe that the reported suspect was in plaintiffs' building or residence.

157. Defendant officer Perez was hasty and careless and jumped to the conclusion that the suspect ran into plaintiffs' building and plaintiffs' apartment. Plaintiffs' building was simply the closest building to where the four men were reportedly standing when they began to flee. Someone had shouted "third floor." Other officers just followed Perez and never even saw the four men, let alone saw them enter plaintiffs' building or apartment.

158. In fact, when defendant officers forcibly entered plaintiffs' apartment, they did not find anyone besides plaintiffs. Their BWC videos show they did not encounter anyone in the apartment besides plaintiffs.

159. Similarly, when defendant officers forcibly entered plaintiffs' apartment, none of the plaintiffs matched the caller's vague description of the reported suspect; Mr. Winters was not wearing black pants and was not wearing a hoodie. Even if Mr. Winters partially matched the generalized description of common dress, defendant officers immediately felt his pulse and concluded he was not the fleeing suspect, but they did not leave the apartment.

33

160.     Further, in fact none of the suspects ever even entered plaintiffs' apartment building.  Defendant officers' BWC videos do not show anyone entering building.  No officer actually saw anyone enter or exit plaintiffs' building.  Defendant officers never encountered the suspect in the stairway or any other part of plaintiffs' building, and their BWC videos confirm this.

161.     Therefore, at the time that officer Perez and other defendant officers on scene pursued the reported suspect, none had an objectively reasonable belief that the alleged suspect had actually entered plaintiffs' building or apartment.  In fact, officers had no reasonable factual basis for believing that the suspect was inside plaintiffs' apartment.

162.     Further, officers did not make any effort to consider all of the information that was available to them; had they done so, they would have concluded they had insufficient information to justify a warrantless entry into plaintiffs' apartment.

163.     Defendant officers had time to acquire information for probable cause.  At the time defendant officers entered the building, supposedly in pursuit of the suspect now inside, all of the entrances and exits to the building were covered by the police; police had the building surrounded.  The odds that the suspect would escape if not apprehended immediately were zero.  Delay would not have meant escape.  Immediate forced entry was simply not required.

164.     Given that defendant officers had time, they could have knocked on each apartment door in the building, announced their presence, given occupants a chance to open the door, have their questions answered, and sought residents' consent to enter and search.  But defendant officers did not knock on the doors of any apartment in the building or attempt to speak with residents, including plaintiffs.  The first and second-floor apartments in plaintiffs'

building were also occupied, and the residents were at home that evening. Defendant officers never entered either the first or second floor apartments at any time.

165. Given that defendant officers had time, officers could have spoken with eyewitnesses at the gas station or outside on Lawler. They did not.

166. Given that defendant officers had time, they could also have secured a search warrant while the building was surrounded and guarded. They did not.

167. But defendant officers failed to make an objectively reasonable effort to find out whether the reported suspect had entered plaintiffs' building or which apartment he was supposedly hiding in before forcibly entering plaintiffs' apartment. Someone merely shouted, "third floor," and officers rushed up to the third-floor apartment in plaintiffs' building and kicked the door in.

168. Defendant officers also lacked facts constituting exigent circumstances that might have justified their warrantless entry into plaintiffs' residence.

169. First, defendant officers had time to pursue other strategies to prevent the reported suspect from fleeing instead of making an immediate forced entry into plaintiffs' home. At the time defendant officers entered the building, supposedly in pursuit of the suspect now inside, all of the entrances and exits to the building were covered by the police; police had the building surrounded. The odds that the suspect would escape if not apprehended immediately were zero. Delay would not have meant escape.

170. In fact, the officers were not and could not have been in hot pursuit of any fleeing suspect because, in fact, the suspect never entered plaintiffs' home, and they never saw him enter. Defendant officers' BWC shows that no one ever entered or exited plaintiffs' building or apartment, and officers did not find anyone but plaintiffs in the apartment.

171. Second, there was no risk of destruction of evidence, since police had no information that the suspect was in possession of narcotics or that plaintiffs' apartment contained narcotics. A firearm cannot easily be disposed of from inside an apartment. Once officers entered lawfully, they would still be able to search for any firearms that the suspect had hidden.

172. Third, officers had no information that the residents in plaintiffs' apartment had been injured or were in any distress or danger that required emergency aid. No one had called for help from the apartment or the building, and officers did not hear any distressing voices coming from plaintiffs' apartment or the building. Officers did not ask Mr. Winters through the door if he or members of household were safe or needed help.

173. Officers had no information about the suspect's relationship, if any, to the people in the residence and whether he was a danger to them, assuming he was even there.

174. In sum, officers had nothing but speculation or a mere suspicion that anyone inside plaintiffs' apartment needed emergency aid.

175. Therefore, defendant officers' unauthorized, forced entry into and search of plaintiffs' home violated plaintiffs' Fourth Amendment right to be free from unreasonable searches and seizures of their homes and persons. Officers' immediate, forced entry was reckless, not reasonable.

176. Defendant officer Perez and any other defendant or non-defendant officers with him reasonably knew or should have known that the suspect would not be found in plaintiffs' apartment.

177. Defendant officer Perez and any other defendant or non-defendant officers with him had a duty to reasonably investigate information available to him on the scene regarding the suspect's whereabouts before forcibly entering plaintiffs' apartment.

178.     Such an inquiry was so easy to make without risking the suspect's escape. Officers had multiple sources of information available to them, had they bothered to use them.

179.     Consequently, defendant officer Perez led officers to and entered the wrong apartment, plaintiffs' apartment, a place he never had probable cause to enter and search. In light of all the facts and circumstances, his error was not objectively reasonable.

180.     Officers' actions in these respects were objectively unreasonable and were undertaken intentionally, with malice and reckless indifference to plaintiffs' constitutional rights.

181.     As the direct and proximate result of officers' misconduct, plaintiffs suffered and continue to suffer injury and harm.

### *Defendant Officers' Conduct Was Willful and Wanton or Grossly Negligent*

182.     Defendant officers' conduct under this count merits an award of punitive damages.  Defendant officers' shocking action of forcibly entering a residence, plaintiffs' residence, when they had failed to see where the alleged suspect fled to constituted an abuse of power and authority.  Defendant officers' actions harmed honest, hard-working citizens who were totally innocent of all criminal conduct.

183.     Defendant officers' conduct toward plaintiffs was undertaken with willful and wanton disregard for the rights of others.  Officers acted with actual intention or with a conscious disregard or indifference for the consequences when the known safety and health of plaintiffs was involved.  Defendant officers acted with actual malice, with deliberate violence, willfully or with such gross negligence as to indicate a wanton disregard of the rights of others.

184.     In light of the character of defendant officers' actions toward plaintiffs and the lasting or permanent psychological injury that defendants' conduct has caused plaintiffs, defendants' conduct merits an award of punitive damages.

## COUNT III – UNLAWFUL SEARCH – UNREASONABLE MANNER OF ENTRY AND SEARCH – 42 U. S. C. § 1983
### (All Adult Plaintiffs)

185.    The adult plaintiffs re-allege paragraphs 1-24, 37-111, and 144-184 above and incorporate them into this count.  They assert this claim against all defendant and non-defendant officers who entered their apartment, seized them, and searched their apartment.

186.    The manner in which officers conducted their entry into plaintiffs' apartment, their seizure of plaintiffs, and their search of plaintiffs' apartment was objectively unreasonable, in violation of Plaintiffs' Fourth Amendment rights.

187.    For example, defendant and non-defendant officers did not knock and announce and give plaintiffs a reasonable amount of time to come to and open the door voluntarily before they forcibly entered; when they seized plaintiffs inside, defendant and non-defendant officers used excessive force by pointing guns at plaintiffs when they did not resemble the suspect and were fully compliant and did not pose a threat; defendant and non-defendant officers detained and confined Mr. Winters in handcuffs for an unreasonably long period of time and in an unreasonable and humiliating manner; defendant and non-defendant officers remained in plaintiffs' apartment for an unreasonably long period of time after they were aware that the suspect was not in the apartment; and defendant and non-defendant officers screamed, cursed at and verbally plaintiffs, especially Mr. Winters.

188.    Officers' manner of entry, seizure and search was objectively unreasonable in these and other ways and was undertaken intentionally, with malice and reckless indifference to plaintiffs' constitutional rights.

189.    Under the circumstances, officers had reasonable alternative law enforcement techniques available to them for an effective entry, seizure and search.

38

190.    As the direct and proximate result of officers' misconduct, plaintiffs suffered and continue to suffer injury and harm.

### *Defendant Officers' Conduct Was Willful and Wanton or Grossly Negligent*

191.    Defendant officers' conduct under this count merits an award of punitive damages to plaintiffs.  Defendant officers' shocking displays of force against a totally unarmed family constituted an abuse of power and authority.  Defendant officers' actions set forth above were directed towards unarmed citizens who were fully compliant and cooperative and innocent of all criminal conduct.

192.    Defendant officers' conduct toward plaintiffs was undertaken with willful and wanton disregard for the rights of others.  Officers acted with actual intention or with a conscious disregard or indifference for the consequences when the known safety and health of plaintiffs was involved.  Defendant officers acted with actual malice, with deliberate violence, willfully or with such gross negligence as to indicate a wanton disregard of the rights of others.

193.    In light of the character of defendant and non-defendant officers' actions toward plaintiffs and the lasting or permanent psychological injury that defendants' conduct has caused plaintiffs, defendants' conduct merits an award of punitive damages.

### COUNT IV – UNLAWFUL SEARCH/WARRANTLESS "ENTRY"/ FAILURE TO RETREAT – 42 U. S. C. § 1983 (All Plaintiffs)

194.    Plaintiffs re-allege paragraphs 1 – 24, 37-111, and 144-184 above and incorporate them into this count.  Plaintiffs assert this claim against all defendant and non-defendant officers who forcibly entered and searched and remained in their apartment.

195.    These officers' actions of continuing to remain within and search plaintiffs' apartment well after they were aware that the supposed suspect was not in the

apartment and, therefore, that officers had entered and searched the wrong apartment and seized the wrong people (not the alleged suspect reportedly seen at the gas station) constituted a violation of plaintiffs' Fourth Amendment right to be free from unreasonable searches and seizures.

196.     From the moment officers were aware that the supposed suspect was not in plaintiffs' apartment and saw no sign that he had ever been in plaintiffs' apartment, they were no longer legally authorized to be within or to search plaintiffs' home or to continue to detain plaintiffs, and they were obligated to immediately retreat from plaintiffs' apartment.  At this point, defendants knew they lacked probable cause and that no exigent circumstances existed that justified their continued, warrantless presence in plaintiffs' home.

197.     Similarly, based upon these same observations which officers made moments after entry, they knew or reasonably should have known that they made a mistake in believing that supposed suspect had entered plaintiffs' apartment and that, consequently, they lacked probable cause to be in plaintiffs' apartment.

198.     Within seconds of forcibly entering plaintiffs' home and seizing plaintiffs, officers had information that put them on notice that they had entered the wrong apartment (that the suspect did not enter plaintiffs' apartment).  For example, defendants immediately felt Mr. Winters' pulse and determined that he had not been running; they also observed that he was not dressed in all black.  They also observed that the only other black male in the apartment was an elderly man asleep under in his bed.  Officers found no other males in the apartment.

199.     Nevertheless, officers did not retreat from plaintiffs' residence, cease searching their residence or release Mr. Winters from detention; well after they became aware

there was no sign the supposed suspect ever entered plaintiffs' apartment, they remained in the apartment and continued searching and detaining plaintiffs.

200.    One or more defendant and/or non-defendant officers had a reasonable opportunity to prevent or stop the violations of plaintiffs' constitutional rights alleged in this count but stood by and failed to take any action.

201.    Officers' actions in these respects were objectively unreasonable and were undertaken intentionally, with malice and reckless indifference to plaintiffs' constitutional rights.

202.    As the direct and proximate result of officers' misconduct, plaintiffs suffered and continue to suffer injury and harm.

### COUNT V – FALSE ARREST AND FALSE IMPRISONMENT – 42 U. S. C. § 1983
### (Plaintiff Steven Winters)

203.    Plaintiff Steve Winters re-allege paragraphs 1 – 24, 37-111, and 144-184 above and incorporates them into this count.  He asserts this claim against all defendant officers who detained him.

204.    Defendant and non-defendant officers falsely arrested and imprisoned Mr. Winters in his own home when, (a) without a warrant, without probable cause and without reasonable suspicion, they (b) commanded him to get on the floor at gunpoint (c) through him on the floor (d) searched him and (e) kept him confined on the floor at gunpoint and in a painful position, including long after they became aware that he was not the supposed suspect and, consequently, that he was an innocent third party.

205.    Officers' actions constituted a violation of the Mr. Winters' Fourth Amendment right to be free from unreasonable searches and seizures.

206.    When officers commanded Mr. Winters to get down on the floor, handcuffed him and confined him there, they unlawfully deprived him of his liberty to move about, despite the fact that officers had no probable cause or reasonable suspicion to think that he had done anything illegal.  This violated plaintiff's rights under the Fourth and Fourteenth Amendments to the U. S. Constitution.

207.    Mr. Winters did not match the vague, general description of the supposed suspect - he was not dressed in all black, was not wearing a hoodie, and did not have a gun – and officers immediately felt his pulse and discerned that he had not just stopped running moments earlier.

208.    Moreover, one or more officers had a reasonable opportunity to prevent or stop the violations of plaintiff's constitutional rights but stood by and failed to take any action.

209.    Through physical force and the invalid use of legal authority, officers acted to arrest, restrain and confine plaintiff to a bounded area.

210.    Plaintiff was acutely aware of and was harmed by officers' confinement, as detailed above.  *Inter alia*, Mr. Winters feared for his life and was in pain.

211.    Officers' actions in this respect were objectively unreasonable and undertaken intentionally, with malice and reckless indifference to plaintiff's constitutional rights.

212.    As the direct and proximate result of officers' misconduct, plaintiff suffered and continue to suffer injury and harm.

### COUNT VI – ASSAULT – STATE LAW
### (All Plaintiffs)

213.    Plaintiffs Steven Winters, Savayla Winters, Rehsyla Winters, and Jessie Evans re-allege and incorporate paragraphs 1 – 24, 25-36, 37-111, and 144-184 above in this

count. They assert this claim against all defendant and non-defendant officers who entered plaintiffs' apartment and pointed their firearms directly at one or more plaintiffs.

214.    The actions of the defendant and non-defendant officers set forth above, including pointing guns at close range at Steven Winters, Savayla Winters, Rehsyla Winters, and Jessie Evans, created reasonable apprehensions in plaintiffs of immediate, unauthorized, and harmful contact to plaintiffs' persons.

215.    These actions exceeded defendants' lawful authority under the circumstances because a) they lacked probable cause to enter and seize plaintiffs and because, even if they had had probable cause, b) pointing firearms at totally compliant people who do not pose any threat to officer safety constitutes unreasonable or excessive force. For each reason, defendants' use of force against plaintiffs was not lawfully authorized.

216.    When pointing their firearms at plaintiffs, officers intended to bring about apprehensions of immediate harmful contact in plaintiffs or knew that their actions would bring about such apprehensions.

217.    In the alternative, the conduct of defendants, in pointing at fully compliant people who posed no danger, including young children, was willful and wanton and constituted a course of action which shows an actual or deliberate intention to cause harm or which, if not intentional, shows an utter indifference to or conscious disregard for the safety of others and/or their property.

218.    The conduct of defendants in forcibly entering a residence with guns drawn and pointed at the occupants is highly associated with the risk of serious injury. Numerous prior injuries have occurred to civilians in this context. Officers failed to take reasonable precautions after having knowledge of impending danger to plaintiffs.

219.     The officers' actions were the direct and proximate cause of plaintiffs' apprehensions.

220.     Plaintiffs have been seriously harmed by officers' actions.

**COUNT VII – BATTERY**
**(Plaintiff Steven Winters)**

221.     Plaintiff Steven Winters re-alleges and incorporates paragraphs 1 – 24, 37-111, and 144-184 above into this count.  He asserts this claim against the defendant officer who through Mr. Evans to the floor and kept him there at gunpoint with a knee painfully in his back.

222.     The actions of defendant officers set forth above, including throwing Mr. Evans to the floor and holding him facedown at gunpoint with a knee in his back brought about unauthorized, offensive, and harmful, physical contacts to plaintiff's person.  These actions caused immediate and lasting pain to Mr. Evans.

223.     These actions exceeded defendant officers' lawful authority under the circumstances because a) officers lacked probable cause to enter and seize plaintiff, who did not look like the supposed suspect, and because, even if officers had had probable cause, b) painfully throwing a person and keeping them painfully prone when he was totally compliant and did pose any threat to officer safety constituted unreasonable or excessive force.  For each reason, defendants' use of force against plaintiff was not lawfully authorized.

224.     The defendant officer intended to bring about harmful and offensive physical contact to plaintiff's person.

225.     In the alternative, the conduct of defendant was willful and wanton and constituted a course of action which shows an actual or deliberate intention to cause harm or which, if not intentional, shows an utter indifference to or conscious disregard for the safety of others and/or their property.

226.    The conduct of defendants in suddenly and forcibly entering a residence without a warrant are generally associated with a risk of serious injury.  Numerous prior injuries have occurred to civilians in this context.  Officers failed to take reasonable precautions after having knowledge of impending danger to plaintiffs.

227.    The defendant officer's actions were the direct and proximate cause of harmful and offensive physical contact to plaintiff's person.

228.    Plaintiff was seriously harmed by the defendant officer's actions.

### COUNT VIII - INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS – STATE LAW
#### (All Plaintiffs)

229.    Plaintiffs re-allege and incorporate paragraphs 1 – 24, 37-111, and 144-184 above in this count and assert this claim against all defendant and non-defendant officers who forcibly entered plaintiffs' apartment and seized them.

230.    The actions, omissions and conduct of defendant officers set forth above – including but not limited to pointing guns at plaintiffs, including Savayla and Rehsyla - were extreme and outrageous and exceeded all bounds of human decency.

231.    Officers' actions, omissions and conduct above were undertaken with the intent to inflict and cause severe emotional distress to plaintiffs, with the knowledge of the high probability that their conduct would cause such distress, or in reckless disregard of the probability that their actions would cause such distress.

232.    Officers, who occupied positions of special trust and authority, knew, had reason to know or believed that plaintiffs, whom they saw included young children, women and the elderly, were especially vulnerable and fragile.

233.     As a direct and proximate result of officers' extreme and outrageous conduct, plaintiffs suffered and continue to suffer long-term, severe emotional distress and trauma.

234.     In the alternative, the conduct of defendants was willful and wanton and constituted a course of action which shows an actual or deliberate intention to cause harm or which, if not intentional, shows an utter indifference to or conscious disregard for the safety of others and/or their property.

235.     The conduct of defendants in forcibly entering a residence without search warrant and pointing guns at occupants are generally associated with a risk of serious injury. Numerous prior injuries have occurred to civilians in this context.  Officers failed to take reasonable precautions after having knowledge of impending danger to plaintiffs.

236.     Officers' conduct was a proximate cause of plaintiffs' injuries and their extreme, severe, long-term emotional distress and trauma.

### COUNT IX – TRESPASS/ENTRY – STATE LAW
**(All Plaintiffs)**

237.     Plaintiffs re-allege paragraphs 1 – 24, 37-111, and 144-184 above and incorporate them in this count.  Plaintiffs assert this claim against all defendant and non-defendant officers who forcibly entered plaintiffs' apartment without probable cause or exigent circumstances.

238.     By forcibly entering plaintiffs' residence when they did not actually have probable cause to believe that the supposed suspect had entered plaintiffs' apartment, defendant and non-defendant officers were not lawfully authorized to enter upon the premises and, therefore, they physically invaded plaintiffs' right to enjoy exclusive possession of their residence.

239.     In the alternative, the conduct of defendants was willful and wanton and constituted a course of action which shows an actual or deliberate intention to cause harm or which, if not intentional, shows an utter indifference to or conscious disregard for the safety of others and/or their property.

240.     The conduct of defendants in forcibly entering a residence without probable cause is generally associated with a risk of serious injury.  Numerous prior injuries have occurred to civilians in this context.  Officers failed to take reasonable precautions after having knowledge of impending danger to plaintiffs.

241.     Officers' actions caused a physical invasion of plaintiffs' legal right to the exclusive possession and enjoyment of their residence.

242.     Plaintiffs were harmed by officers' physical invasion of their residence.

## COUNT X – TRESPASS/FAILURE TO RETREAT – STATE LAW
### (All Plaintiffs)

243.     Plaintiffs re-allege paragraphs 1 – 24, 37-111, and 144-184 above and incorporate them in this count.  Plaintiffs assert this claim against all defendant and non-defendant officers who remained in plaintiffs' apartment after they became aware that they lacked probable cause to remain in the residence.

244.     By physically remaining within plaintiffs' residence (instead of immediately retreating) after they became aware that the supposed suspect was not in plaintiffs' apartment and that there was no sign he had ever been in plaintiffs' apartment, defendant and non-defendant officers remained when they were not lawfully authorized to remain and, therefore, they physically invaded plaintiffs' right to the exclusive possession and enjoyment of their residence.

245.     In the alternative, the conduct of defendants was willful and wanton and constituted a course of action which shows an actual or deliberate intention to cause harm or which, if not intentional, shows an utter indifference to or conscious disregard for the safety of others and/or their property.

246.     Officers' actions caused a physical invasion of plaintiffs' legal right to the exclusive possession and enjoyment of their residence.

247.     Plaintiffs were harmed by officers' physical invasion of their residence.

## COUNT XI – *RESPONDEAT SUPERIOR* – STATE LAW
### (All Plaintiffs)

248.     Plaintiffs re-allege paragraphs 1 – 24, 37-111, and 144-184 and 213 – 247 above and incorporate them into this count.  Plaintiffs assert this claim against defendant City of Chicago.

249.     In committing the acts and omissions alleged above, defendant officers were at all times members, employees and agents of CPD and the City of Chicago and were acting within the scope of their employment.

250.     Defendant City of Chicago is, therefore, liable as principal for all common law torts committed by its employees and agents within the scope of their employment.

## COUNT XII – INDEMNIFICATION – STATE LAW
### (All Plaintiffs)

251.     Plaintiffs re-allege and incorporate paragraphs 1 – 24, 37-111, and 144-184 and 213 – 247 above.  Plaintiffs assert this count against defendant City of Chicago.

252.     Illinois law, 745 ILCS 10/9-102, directs public entities to pay any common law tort judgment for compensatory damages for which employees are held liable within the scope of their employment activities.

253.    Defendant officers were and are employees of the City of Chicago who acted within the scope of their employment when committing the actions and omissions detailed above.

## **PRAYER FOR RELIEF (ALL COUNTS)**

WHEREFORE, plaintiffs respectfully request that the Court enter judgment in their favor and against defendants on each count for:

a.    Compensatory damages;

b.    Punitive damages where pled in the counts above;

c.    Reasonable attorney's fees and litigation costs and expenses; and

d.    Such other or further relief as the Court deems just.

Respectfully submitted,

s/Al Hofeld, Jr.
Al Hofeld, Jr.

Al Hofeld, Jr.
LAW OFFICES OF AL HOFELD, JR., LLC
30 N. LaSalle Street, Suite #3120
Chicago, Illinois 60602
(773) 241-5844
Fax - 312-372-1766
al@alhofeldlaw.com

**JURY DEMAND**

Plaintiffs demand trial by jury.

s/Al Hofeld, Jr.
Al Hofeld, Jr.

**NOTICE OF LIEN**

Please be advised that we claim a lien upon any recovery herein for 1/3 or such amount as a court awards.

s/Al Hofeld, Jr.
Al Hofeld, Jr.

**NOTICE OF FILING AND CERTIFICATE OF SERVICE BY ELECTRONIC MEANS**

I, Al Hofeld, Jr., an attorney for plaintiffs, hereby certify that on August 4, 2021, filing and service of the foregoing **_Complaint_** was accomplished pursuant to ECF as to Filing Users, and I shall comply with LR 5.5 and the Federal Rules of Civil Procedure as to service on any party who is not a Filing User or represented by a Filing User.

s/Al Hofeld, Jr.
Al Hofeld, Jr.

Al Hofeld, Jr.
LAW OFFICES OF AL HOFELD, JR., LLC
30 N. LaSalle Street, Suite #3120
Chicago, Illinois 60602
(773) 241-5844
Fax - 312-372-1766
al@alhofeldlaw.com